UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PORTLAND DIVISION

THE REGENCE GROUP, REGENCE
BLUESHIELD, REGENCE BLUECROSS
BLUESHIELD OF OREGON, REGENCE
BLUESHIELD OF IDAHO, and REGENCE
BLUECROSS BLUESHIELD OF UTAH,

          Plaintiffs,

    v.

TIG SPECIALTY INSURANCE COMPANY,

          Defendant.

Case No. 3:07-cv-01337-HA

OPINION AND ORDER

HAGGERTY, District Judge:

    Plaintiffs The Regence Group, Regence Blueshield, Regence Bluecross Blueshield of

Oregon, Regence Blueshield of Idaho, and Regence Bluecross Blueshield of Utah (collectively,

"Regence" or "plaintiffs") brought this action seeking a declaration that defendant TIG Specialty

Insurance Company ("TIG") is obligated to pay defense and indemnity costs related to a class

action lawsuit known in this case as "*Thomas*" (or "*Thomas/Love*"), and seeking damages arising

from TIG's claims handling of the *Thomas* case and two other class action lawsuits. Regence

asserts the following six claims against TIG: (1) declaratory relief; (2) breach of contract; (3)

1 - OPINION AND ORDER

breach of the implied duty of good faith and dealing; (4) bad faith; (5) fraud in the inducement; and (6) fraudulent misrepresentation.  TIG has counterclaimed for declaratory relief based on the following: (1) breach of the cooperation agreement; (2) the capitation exclusion; (3) that disgorgement remedies are not covered by the insurance policy; (4) that business changes are not covered by the insurance policy; and (5) that public policy precludes recovery.

After extensive discovery, both parties filed two motions for partial summary judgment. TIG, however, withdrew its motion seeking summary judgment on Regence's claim for attorney fees after the Oregon Supreme Court issued its opinion in *Morgan v. Amex Assurance Co.*, No. SC S059655, 2012 WL 4044722 (Or. Sept. 14, 2012). This court held oral on the remaining motions on September 24, 2012.  For the following reasons, TIG's Motion for Partial Summary Judgment regarding plaintiffs' Bad Faith Cause of Action [706] is DENIED; plaintiffs' Motion for Partial Summary Judgment regarding the Capitation Exclusion [709] is GRANTED; and plaintiffs' Motion for Partial Summary Judgment regarding TIG's Duty to Indemnify [711] is DENIED.

## STANDARDS

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  Summary judgment is improper if material factual issues exist for trial. *Warren v. City of Carlsbad*, 58 F.3d 439, 441 (9th Cir. 1995).

The moving party bears the initial burden of demonstrating the absence of a genuine dispute of material fact for trial, but it need not disprove the other party's case. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 256 (1986).  Once the moving party meets its burden, the

2 - OPINION AND ORDER

adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but must set forth specific facts showing that there is a genuine dispute for trial. *Id.* at 248-49. A nonmoving party cannot defeat summary judgment by relying on the allegations in the complaint, or with unsupported conjecture or conclusory statements. *Hernandez v. Spacelabs Medical, Inc.*, 343 F.3d 1107, 1112 (9th Cir. 2003) (citations omitted).

The court must view the evidence submitted on summary judgment in the light most favorable to the non-moving party. *Campbell v. PricewaterhouseCoopers, LLP*, 642 F.3d 820, 824-25 (9th Cir. 2011). All reasonable doubt as to the existence of a genuine factual dispute should be resolved against the moving party. *MetroPCS, Inc. v. City & County of San Francisco*, 400 F.3d 715, 720 (9th Cir. 2005) (citation omitted).

**FACTUAL BACKGROUND**

The following facts are taken from the parties' briefing, declarations, and copious exhibits. They are undisputed unless otherwise noted and are stated in the light most favorable to the non-moving party where applicable.

### 1.    The Policy At Issue

TIG issued a Managed Care Organizational Liability Insurance Policy No. HCM 38831059 ("the Policy") to Regence for the period of January 1, 2001 to January 1, 2002. Saka Aff. [722] at Ex. 1 (the Policy); Stroup Decl. [723] at Ex. B (same); Kallianis Decl. [708] at Ex. I (TIG's binder letter to Marsh). The Policy provides coverage for managed care errors and omission liability, as well as insurance company errors and omissions. Saka Aff. [722] at Ex. 1, p. 10. The Policy has professional liability limits of $50 million per claim/$50 million aggregate, and a self insured retention applicable to indemnity of $250,000 per claim/$500,000 annually.

3 - OPINION AND ORDER

*Id.* at p. 1; Kallianis Decl. [708] at Ex. I, p. 2. The Policy was a renewal of a policy in effect during the prior year. Kallianis Decl. [708] at Ex. I, p. 5.

The Policy's declarations page lists the "Named Insured" as "The Regence Group," with a Portland, Oregon address. Kallianis Decl. [708] at Ex. D. An endorsement to the Policy included several additional insured entities to the Policy, including the other plaintiffs in this suit. Kallianis Decl. [708] at Ex. E. The Policy also listed the Portland office of The Regence Group's insurance broker, Marsh USA, Inc. ("Marsh"), as the producer for the Policy. Kallianis Decl. [708] at Ex. D. During the relevant period, Kimber Lantry served as TIG's lead underwriter and senior vice president, and he was the underwriter of the Policy. Maguire Aff. [714] at ¶3.

TIG delivered the quotation for the Policy, the related binder, and the Policy to Marsh's offices in Portland. Kallianis Decl. [708] at Exs. H & I; Stroup Decl. [723] at Exs. C & F. Marsh's Portland office sent an invoice for the Policy premium to Regence's office in Portland, and Regence remitted the premium in the amount of $673,631, as well as the surplus lines tax, to Marsh. *Id.* at Ex. F, p. 2; Ex. G at p. 2; Ex. J; Stroup Decl. [723] at Ex. D.

The Policy provided that TIG would pay sums Regence was obligated to pay as damages, including damages assumed under contract, arising out of "[w]rongful acts committed in the course of your business operations" and "[w]rongful acts committed in the course of your providing insurance services." Saka Aff. [722] at Ex. 1, p. 10. The term "wrongful act" is defined under the Policy as "a negligent act, error, omission, misstatement or misleading statement, or breach of duty." *Id.* at p. 34. "Insurance services" is defined as "services of an insurance company rendered by or on behalf of the insured, including such services provided to

others," which includes "[c]laims handling and adjusting." *Id.* at p. 31. "Business operations" is

defined under the Policy as:

> a.    Review of healthcare services, including the cost of health care or necessity of healthcare and utilization review/management, to evaluate the appropriate use of medical care resources, including but not limited to:
>
> - Cost of health care;
> - Necessity of healthcare;
> - Prospective review to authorize treatment or expenses;
> - Concurrent review to evaluate continued patient care;
> - Retrospective review to evaluate medical services already rendered; or
> - Case management or disease management.
>
> b.    Claims handling.
>
> c.    Provider selection, contracting, retention, supervision, monitoring and termination [and]
>
> d.    The following activities or services you provide, or contractually agree to provide: . . .
>
> - Development of practice guidelines and treatment protocols which affect healthcare treatment decisions. . . .

*Id.* at p. 30, 48.

The Policy also included several exclusions. One of the exclusions at issue in this matter

is the capitation exclusion, which provided that the Policy did not apply to "Business Risks." *Id.*

at p. 14. According to the Policy, "Business Risks" included claims arising out of "[c]apitation

payments, including any withholds for risk or bonus agreements, or payments, fee-for-service

payments or other salary payments owed to contracted or employed health care providers[.]" *Id.*

at p. 14.

As originally written, TIG's policy form contained an express exclusion for claims

alleging "actual or alleged" violations of the Racketeer Influenced and Corrupt Organizations Act

5 - OPINION AND ORDER

("RICO"), 18 U.S.C. §§ 1961-1968. *Id.* at p. 14; Maguire Aff. [714] at ¶3. In 1999, Regence's associate general counsel, Margaret Maguire, became concerned about the prevalence of RICO claims being asserted against health care organizations. Maguire Aff. [714] at ¶4; Kallianis Decl. [759] at Ex. A, p. 2 (noting that her concern was based on RICO class actions regarding "financial incentives to doctors and failure to disclose those arrangements"); Saka Aff. [722] at Ex. 143, p. 3. Therefore, Maguire expressly sought coverage for RICO claims as part of Regence's January 1, 2000 to January 1, 2001 policy with TIG. Maguire Aff. [714] at ¶4-5; *see also* Kallianis Decl. [759] at Ex. F, p. 2-3 (including notes from Marsh about discussion with Maguire on RICO coverage in November 1999); Ex. G (noting Marsh's intent to obtain RICO coverage at least for defense); Saka Aff. [722] at Ex. 143, p. 4.

During a meeting on December 1, 1999 between Maguire, Marsh, and TIG, Lantry agreed on behalf of TIG to remove the RICO exclusion and provide coverage for RICO claims in exchange for an additional premium. Maguire Aff. [714] at ¶5. At the time, Maguire believed that Regence was paying for defense and indemnity coverage for all types of RICO claims. Maguire Aff. [714] at ¶6; Kallianis Decl. [759] at Ex. A, p. 3; Saka Aff. [722] at Ex. 143, p. 5. TIG did not mention that only certain RICO claims would be covered. Maguire Aff. [714] at ¶6; Saka Aff. [722] at Ex. 156, p. 27-28 (Lantry stating that he never told Regence or Marsh that the capitation or other exclusion would preclude RICO coverage). Maguire cannot recall if Marsh affirmatively told her that the RICO coverage would cover any RICO claims that could be asserted against Regence. Kallianis Decl. [759] at Ex. A, p. 3.

TIG deleted the RICO exclusion and made six other changes to the 2000 policy regarding RICO claims that had been negotiated between Marsh and TIG. Kallianis Decl. [759] at Ex. H,

p. 2-3; Kallianis Decl. [708] at Ex. I, p. 10 (noting the deletion of the RICO exclusion and adding

new language to the Policy).  Maguire believed those changes were intended to make clear that

RICO claims were covered.  Maguire Aff. [714] at ¶5; Saka Aff. [722] at Ex. 143, p. 4-5.

Because the Policy at issue was a renewal of the 2000 policy, it was intended to include

the additional RICO coverage.  Maguire Aff. [714] at ¶7-8; Stroup Decl. [723] at Ex. B, p. 72-73

(noting that the Policy included a "Deletion of RICO Exclusion," which provided that certain

sections of the form policy were deleted to provide for RICO coverage).  In the December 2000

binder letter to Marsh, Lantry confirmed that RICO coverage would be included in the Policy.

Maguire Aff. [714] at ¶8 & Ex. A, p. 5-6.  The letter provided as follows:

> In consideration of the additional premium listed below, exclusion #17, [RICO]
> exclusion, will be deleted.  In addition, the "in tort" wording in insuring agreements
> under Section I, Part A will be deleted insofar as it applies to any RICO action.
> Further, Exclusion 8 - Violation of Law under Section I, Part F will be deleted insofar
> as it applies to any RICO action.  In addition, the exclusion for the multiplied portion
> of any award will be clarified so that it does not apply to RICO claims.
>
> The RICO coverage will be provided sharing the $30M per claim/$30M annual
> aggregate limits of liability of the managed care errors & omissions coverage, and
> sharing the same $250,000 per claim/$500,000 annual aggregate retention, applicable
> to indemnity only.

*Id.*

Maguire understood and expected that the Policy would cover any sums Regence became

legally obligated to pay as a result of RICO claims, including damages, injunctive relief, attorney

fees, and other remedies.  Maguire Aff. [714] at ¶9.  TIG had previously written managed care

policies that only covered the defense of RICO claims.  Saka Aff. [722] at Ex. 156, p. 7, 19

(Lantry testifying that the Regence and Coventry policies were not limited to defense of RICO

claims, unlike five other policies that TIG had written for its other insureds); Exs 3-5, 7, 13 (the

7 - OPINION AND ORDER

five other policies). Lantry, however, testified that the Policy sold to Regence provided both

defense and indemnity coverage for RICO claims, subject to other terms and conditions in the

Policy. *Id.* at Ex. 156 at 16, 19. TIG never suggested that the capitation exclusion would

preclude coverage for RICO claims. Maguire Aff. [714] at ¶10.

### 2.    The Underlying Actions

Plaintiffs were named as defendants in three putative class action lawsuits from 2002

through 2003: *Thomas v. Blue Cross & Blue Shield Assoc., et al.*, Case No. 1:03-cv-21296 (S.D.

Fla.) ("*Thomas*"); *Solomon v. Blue Cross BlueShield Ass 'n, et al.*, Case No. 1:03-cv-22935 (S.D.

Fla.) ("*Solomon*"); and *Tacoma Orthopedic v. Regence BlueShield, et al.*, Case No. 02-2-05982-7

(Wash. Super. Ct.) ("*Tacoma*"). Regence also received a demand letter in 2001 from Robert

Grimm, M.D. advising Regence that a class action complaint would likely be filed in Oregon.

These suits were initiated by healthcare providers who alleged that Regence had violated

RICO by conspiring with other health maintenance organizations (HMOs) to deny, delay, and

diminish payments due to the providers through the use of computerized claims payment and

processing systems designed to avoid or delay paying what Regence rightfully owed the

providers. Regence promptly advised TIG of the underlying actions, and TIG communicated its

coverage positions to Regence. Kallianis Decl. [708] at Exs. K-M; Rogers Aff. [713] at ¶11-13.

TIG accepted coverage for the *Tacoma* matter in May of 2002. Rogers Aff. [713] at ¶11;

Saka Aff. [722] at Ex. 24. At that time, TIG did not assert the capitation exclusion as a defense

to coverage, and did not reserve its rights as to any other defense. *Id.* In August 2003, however,

TIG advised Regence that it was reserving its rights with respect to providing a defense in

*Tacoma*, and accepted the defense of *Thomas* subject to a reservation of rights. Rogers Aff.

8 - OPINION AND ORDER

[713] at ¶12; Saka Aff. [722] at Exs. 32 & 33. TIG then asserted the capitation exclusion in both

cases. *Id.* TIG also accepted coverage in the *Solomon* action with a reservation of rights

including the capitation defense. Rogers Aff. [713] at ¶13.

The original *Thomas* complaint included three civil causes of action against Regence,

including: (1) conspiracy; (2) aiding and abetting; and (3) declaratory and injunctive relief. Saka

Aff. [722] at Ex. 27, p. 85-89. The *Thomas* complaint was amended several times while Regence

was in the case. In their motion seeking to file their fifth amended complaint, the *Thomas*

plaintiffs sought to remove allegations relating to claims they were not pursuing, including

"capitation and certain claims on behalf of non-participating physicians relating to quasi-

contractual theories of relief." Kallianis Decl. [759] at Ex. K, p. 4 & n.2.

The fifth amended complaint alleged that the defendants violated the civil RICO statute

by "systematically deny[ing], delay[ing,] and diminish[ing] the payments due to physicians so

that they are not paid in a timely manner for the covered, medically necessary services they

render." *Id.* at Ex. K, p. 16. The *Thomas* plaintiffs further alleged that Regence and other HMOs

engaged in this scheme through their use of an automated processing system whereby the medical

providers were required to submit a standard coded claim form with current procedural

terminology (CPT) codes, and that enabled the HMOs to use automated logic to deny, downcode,

or bundle the claims based on the CPT codes without any analysis of medical necessity. *Id.* at p.

63-65. The *Thomas* plaintiffs sought damages "suffered by reason of payments due them for

services rendered having been wrongfully withheld, denied or reduced through Defendants'

predicate acts and [RICO] violations . . . ." *Id.* at Ex. K, p. 98-99. All three RICO counts were

asserted against all defendants, including Regence, "with whom Plaintiffs have no contracts . . .

[and] with whom they have contracts to the extent their claims stem from contractual

relationships with other Defendants." *Id.* at Ex. K, p. 95-96.

### 3.     The Prior Coverage Action

TIG stopped paying Regence's defense costs in March of 2004, and Regence filed suit

against TIG for coverage in this court. *See* Case No.: 04-453-JO; Stroup Decl. [723] at Ex. I.

TIG counterclaimed for declaratory relief based on breach of the cooperation clause, the

capitation exclusion, and asserting that restitution was not included in the Policy.  Kallianis Decl.

[759] at Ex. P.  On November 5, 2004, the parties entered into a settlement agreement. *See*

*generally* Kallianis Decl. [708] at Ex. A.  The settlement agreement was originally set to expire

in May 2007, but it was jointly extended until August 20, 2007.  Rogers Aff. [713] at ¶16.

As part of the settlement, TIG agreed to pay reasonable defense costs and to defend

Regence in the underlying actions through settlement or judgment.  Kallianis Decl. [708] at Ex.

A., p. 2-3.  The parties agreed to discuss "all major strategic decisions" about the defense of the

underlying actions, and to "work together to try to adopt mutually agreeable strategies." *Id.* at p.

8.  It was agreed, however, that Regence would maintain

> the control of the defense of the litigation and make the ultimate decisions relating
> to the strategy, including but not limited to, whether to settle; the terms and
> conditions of any settlement; the amount of any settlement (however . . . Regence
> cannot commit any TIG funds without TIG's agreement); whether to join or leave any
> joint defense group; the selection of counsel; and whether to switch counsel.

*Id.*

Both parties agreed to release each other from any "claims and counterclaims made in the

coverage action relating to bad faith and the cooperation clause." *Id.* at 9.  However, they

10 - OPINION AND ORDER

reserved the right to assert claims "arising from wrongful conduct taking place after the execution of the Agreement." *Id.*

The parties further agreed that TIG could have access to Regence's defense counsel, McDermott Will & Emery LLP ("MWE") and documents relating to the underlying actions for the duration of the settlement agreement. Rogers Aff. at ¶17. The parties also entered into a common interest agreement to share documents during the term of the agreement. *Id.* The common interest agreement provided that the parties had "a complete identity of interest and community of interest in the defense of the [underlying actions]." *Id.* at ¶18. Pursuant to that agreement, Regence shared many confidential documents with TIG regarding the defense of the underlying actions, including notes from settlement negotiations, drafts of settlement agreements, status updates, litigation risk and exposure analyses, and legal advice from Regence's counsel. *Id.* at ¶19.

### 4.    The *Thomas* Settlement

Regence settled the *Thomas* action in April 2007 prior to any merits discovery. Rogers Aff. at ¶21-22. TIG encouraged Regence to enter into the settlement, agreed that it would not raise lack of consent as a defense to coverage, and did not object to the settlement on reasonableness grounds. *Id.* at ¶24.

According to the terms of the settlement, Regence agreed to pay certain sums (more than $9 million) and to change its business practices so that providers would receive full and prompt payment on future invoices. *Id.* at ¶25; *Thomas* Settlement Agreement [569-1]. The framework for the agreement generally resulted from settlements in similar cases before Judge Federico Moreno of the United States District Court for the Southern District of Florida, who presided

11 - OPINION AND ORDER

over the *Thomas* and *Solomon* actions. Rogers Aff. at ¶7, 26. The *Solomon* and *Tacoma*

lawsuits were dismissed without any settlement payment.

>    **5.**    **This Litigation**

Regence sought coverage from TIG to indemnify Regence for many months leading up

to the *Thomas* settlement. Rogers Aff. at ¶29. On March 27, 2007, Jenny Rogers, part of

Regence's general counsel, made a written request for TIG to fund the settlement. *Id.* TIG

denied coverage for the business changes portion of the settlement, and proposed that the parties

discuss funding of the monetary component of the settlement. *Id.* TIG's representatives never

took the position with Regence that there was no coverage for the monetary component. Maguire

Aff. [714] at ¶12. The parties attempted mediation in August of 2007, but were unsuccessful.

Rogers Aff. at ¶30-31. This litigation followed.

## DISCUSSION

Regence seeks summary judgment on TIG's duty to indemnify it for the monetary and

business changes components of the settlement in *Thomas,* and on TIG's counterclaim based on

the capitation exclusion. TIG seeks summary judgment on plaintiffs' bad faith claims (Counts III

& IV in the Amended Complaint). These motions will be discussed in turn; however, because

the parties also disagree on the insurability of RICO claims under Oregon law in general, the

court will discuss this issue first.

**I.    Insurability of RICO Claims as a Matter of Law**

At the outset, TIG asserts that RICO is inherently a criminal statute that provides civil

and criminal liability for intentional, wrongful conduct that should not be insurable as a matter of

law. Regence responds that it specifically contracted for RICO coverage, it paid an additional

premium for that coverage, and that RICO claims are not necessarily based on intentional conduct. This court determines that genuine factual issues preclude summary judgment.

### A.    Public policy

Oregon has long recognized the principle that "a clause in a contract of insurance purporting to indemnify the insured for damages recovered against him as a consequence of his intentional conduct in inflicting injury upon another is unenforceable by the insured on the ground that to permit recovery would be against public policy." *Groshong v. Mutual of Enumclaw Ins. Co.*, 923 P.2d 1280, 1284 (Or. Ct. App. 1996) (quoting *Isenhart v. General Cas. Co.*, 377 P.2d 26, 53 (Or. 1962)). However, this rule precludes coverage only for "intentional acts whose purpose is to cause an injury of the kind giving rise to the insured's liability." *A-1 Sandblasting & Steamcleaning Co., Inc. v. Baiden*, 643 P.2d 1260, 1265 (Or. 1982) (citation omitted); *see also Harrell v. Travelers Indem. Co.*, 567 P.2d 1013, 1016-17 (Or. 1977) (holding that insuring against reckless conduct is not necessarily against public policy). Thus, "[i]t is not sufficient that the insured's intentional, albeit unlawful, acts have resulted in unintended harm; the acts must have been committed *for the purpose of inflicting the injury and harm* before . . . the public policy against insurability attaches." *Ledford*, 877 P.2d at 83 (emphasis in original) (citation omitted); *see also Groshong*, 923 P.2d at 1285 (holding that public policy precludes insurance coverage for claims in which the "natural and intended consequence" is to cause harm, and "from which an intention to cause harm must necessarily be inferred").

### B.    Brief description of RICO

At the time Regence settled the *Thomas* action, the fifth amended complaint was in operation and only the RICO claims remained. As relevant to *Thomas*, the RICO Act provides

that it shall be unlawful for any person to (1) use or invest income derived, directly or indirectly, from a pattern of racketeering activity or through collection of an unlawful debt in any enterprise which affects interstate commerce; (2) conduct or participate in the affairs of any enterprise which affects interstate commerce through a pattern of racketeering activity or collection of unlawful debt; and (3) conspire to violate any of the previous subsections. 18 U.S.C. § 1962(a)-(d). A "pattern of racketeering activity" requires at least two acts of racketeering activity. 18 U.S.C. § 1961(5). As defined in the statute, "racketeering activity" includes several enumerated federal and state crimes, including mail and wire fraud, which were alleged in *Thomas*. 18 U.S.C. § 1961(1); Saka Aff. [722] at Ex. 26.

In addition to criminal penalties, RICO also provides for civil remedies. 18 U.S.C. §§ 1963, 1964. Any person "injured in his business or property by reason of a violation of [RICO]" may bring a private cause of action in federal district court to "recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fee." *Id.* at § 1964(c). "To state a civil claim for a RICO violation under 18 U.S.C. § 1962(c), a plaintiff must show (1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." *Rezner v. Bayerische Hypo-Und Vereinsbank AG,* 630 F.3d 866, 873 (9th Cir. 2010); *Edwards v. Prime, Inc.,* 602 F.3d 1276, 1291-92 (11th Cir. 2010).

Although the *Thomas* plaintiffs alleged mail or wire fraud[1] as the predicate acts, the claims against Regence alleged conspiracy and aiding and abetting. A plaintiff can establish a

---

[1]  Wire or mail fraud consists of the following elements: (1) formation of a scheme or artifice to defraud; (2) use of the United States mails or wires, or causing such a use, in furtherance of the scheme; and (3) specific intent to deceive or defraud. *Carter v. United States*, 530 U.S. 255, 261 (2000); *United States v. Green*, 592 F.3d 1057, 1064 (9th Cir. 2010); *Kemp v. Am. Tel. & Tel. Co.*, 393 F.3d 1354, 1359 (11th Cir. 2004).

RICO conspiracy claim by showing either (1) that the defendant agreed to the overall objective of the conspiracy, or (2) that the defendant agreed to commit two predicate acts. *Am. Dental Ass'n v. CIGNA Corp.*, 605 F.3d 1283, 1293 (11th Cir. 2010). The *mens rea* element required for conspiring to violate RICO is the same as is required for the predicate crime. *United States v. Baker*, 63 F.3d 1478, 1493 (9th Cir. 1995).

One who aids and abets two predicate acts can be civilly liable under RICO. To establish civil liability for aiding and abetting, a plaintiff must show: (1) that the defendant was generally aware of the defendant's role as part of an overall improper activity at the time that he provides the assistance; and (2) that the defendant knowingly and substantially assisted the principal violation. *Cox v. Adm'r U.S. Steel & Carnegie*, 17 F.3d 1386, 1410 (11th Cir. 1994). For aiding and abetting, the defendant's "knowledge may be shown by circumstantial evidence, or by reckless conduct." *Id.* (citations omitted).

A plaintiff may also state a civil RICO claim against co-conspirators who might not have violated one of the substantive provisions of § 1962 themselves. *Beck v. Prupis*, 529 U.S. 494, 506-07 (2000). Additionally, a corporation can be held vicariously liable for the wrongful acts of its agents under RICO. *Id.* at 1406; *Brady v. Dairy Fresh Products Co.*, 974 F.2d 1149, 1154 (9th Cir. 1992) ("[A]n employer that is benefitted by its employee or agent's violations of section 1962(c) may be held liable under the doctrines of respondeat superior and agency when the employer is distinct from the enterprise[.]").

## C.    Analysis

Although TIG contends that Regence must have engaged in intentional criminal conduct to agree to the remedies provided in the *Thomas* settlement, that is not the only permissible

inference from the settlement. First of all, Regence, like TIG, is a sophisticated insurance company that was well aware of the potential for enormous damages and attorney fees in the *Thomas* action, and could have based its decision to settle the matter for financial reasons. Secondly, the evidence suggests that TIG encouraged Regence to settle the matter. This court declines to punish Regence for resolving *Thomas* in a manner that saved considerable judicial resources and promotes the public policy in favor of settlements. *See Weems v. Am. Int'l Adjustment Co.*, 874 P.2d 72, 74 (Or. 1994) (noting that the court "strongly encourages settlement of all kinds of legal disputes").

Lastly, even if this court assumes *arguendo* that Regence committed the RICO violations alleged in *Thomas*, neither party has established as a matter of law that Regence specifically intended to injure the *Thomas* plaintiffs by entering into the alleged conspiracy. The *Thomas* complaint alleged that the conspiracy could be inferred from several facts, including the automated processes used by the defendants, the use of certain claims procedures, the sharing and dissemination of claims information across all the plans, and the participation and coordination in certain industry groups, etc. These allegations do not necessarily imply an intention to cause harm. *See Am. Dental Ass'n*, 605 F.3d at 1295 (discussing the lawful alternative explanation for the alleged conspiracy in the underlying actions as proper means to "decrease physicians' costs and potentially increase profits") (citing *In re Managed Care Litig.*, 430 F. Supp. 2d 1336, 1348 (S.D. Fla. 2006)). Even if Regence had no specific intent to harm, it could have been held vicariously liable in *Thomas* for its co-conspirators' intentional acts, or for its reckless conduct in aiding its co-defendants.

Therefore, this court concludes that a factual question exists regarding whether Regence maintained an intentional scheme to harm the *Thomas* plaintiffs by denying or delaying payments. TIG is permitted to argue this issue with the jury. However, TIG is not entitled to re-litigate the *Thomas* action. *See Nordstrom, Inc. v. Chubb & Son, Inc.*, 820 F. Supp. 530, 535 (W.D. Wash. 1992) (citing *Luria Bros. & Co. v. Alliance Assurance Co.*, 780 F.2d 1082, 1091 (2nd Cir. 1986)). Rather, both parties may seek to establish at trial whether Regence was potentially liable in the *Thomas* action for unintentional harm based on the facts known to Regence, the *Thomas* complaint, and the resulting settlement agreement. *See id.* (stating that an insured may recover settlement amounts so long as potential liability for the settled action exists on the facts known to the insured, and the settlement was reasonable in view of the size of possible recovery and the likelihood of success in the settled action). If the jury concludes that Regence acted with an intent to harm, Oregon's long standing public policy will preclude coverage for the monetary payment and the cost of the business changes that Regence incurred as part of the *Thomas* settlement.

## II.    Regence's Motions for Partial Summary Judgment Based on the Capitation Exclusion [709] & Duty to Indemnify [711]

Regence seeks summary judgment on its claim for indemnity and TIG's capitation exclusion defense, also known as the "business risks" exclusion. Regence asserts that TIG specifically amended the Policy to cover RICO claims, collected a premium from Regence to provide RICO coverage, and has breached the Policy by declining to provide indemnity coverage for the *Thomas* settlement. TIG argues that the Policy does not provide indemnity coverage for RICO claims, or alternatively, that the capitation exclusion precludes coverage for the claims in

*Thomas.* Because Regence's motions both rely on the court's construction of the same language in the Policy, they will be discussed together for efficiency purposes.

### A.    The Duty to Indemnify

"The duty to indemnify is independent of the duty to defend." *Ledford v. Gutoski*, 877 P.2d 80, 84 (Or. 1994). Unlike the duty to defend, which is based only on allegations in the complaint for which the policy could provide coverage, *id.* at 82, the duty to indemnify is established by "proof of actual facts demonstrating a right to coverage." *Nw. Pump v. Am. States Ins. Co.*, 925 P.2d 1241, 1243 (Or. Ct. App. 1996). Thus, an insurer may have a duty to defend even though it has no duty to indemnify. *ZRZ Realty Co. v. Beneficial Fire and Cas. Ins. Co.*, 266 P.3d 61, 66 (Or. 2011).

Although the Oregon courts have not decided this issue, other courts have held that when an insured settles a claim before trial, the court in a coverage action should determine whether the settled claims fall within the coverage of the policy by looking at the facts inherent in the settlement and the allegations in the underlying complaint. *See, e.g., Texas Farmers Ins. Co. v. Lexington Ins. Co.*, 380 F. App'x 604, 607 (9th Cir. 2010) (quoting *In re Feature Realty Litig.*, 468 F. Supp. 2d 1287, 1295-96 (E.D. Wash. 2006)); *Travelers Ins. Co. v. Waltham Indus. Labs. Corp.*, 883 F.2d 1092, 1099 (1st Cir. 1989) (stating that the duty to indemnify following a settlement is determined by the basis of the settlement); *Am. Home Assur. Co. v. Dykema, Gossett, Spencer, Goodnow & Trigg*, 811 F.2d 1077, 1083 (7th Cir. 1987) ("Because the case was settled before trial, [the underlying] allegations are accepted as true for purposes of determining insurance coverage.").

Regence, however, asserts that when an insured settles a potentially covered claim, Oregon courts use the duty to defend analysis to determine whether the settled claim falls within the coverage of the policy. *See Am. Hardware Ins. Grp. v. West One Auto. Grp., Inc.*, 2 P.3d 413, 415 (Or. Ct. App. 2000) ("Because defendant settled [the underlying] claims, the duty to indemnify is determined by the same principles."). Regence appears to have misunderstood the standard. No other court has followed the reasoning in *American Hardware*, and in fact, the case on which the court in *American Hardware* relies holds to the contrary. *See id.* (citing *Nw. Pump & Equip. Co. v. Am. States Ins. Co.*, 925 P.2d 1241, 1243 (Or. Ct. App. 1996) ("The duty to defend is triggered by the bare allegations of a pleading. In contrast, the duty to indemnify is established by proof of actual facts demonstrating a right to coverage.")).

Instead, Oregon courts have consistently recognized that the duty to defend is separate from the duty to indemnify, such that breach of the duty to defend, even if it results in a settlement by the insured of the underlying suit, does not necessarily require the insurer to pay the settlement costs. *See STK Enterprises, Inc. v. Crusader Ins. Co.*, 14 P.3d 638, 642 (Or. Ct. App. 2000) (noting, even though the underlying case was settled before the insured sought indemnification from the insurer, that "[t]he duty to indemnify, unlike the duty to defend, does not depend on the allegations of the complaint; rather, that duty arises from the facts proved at trial"); *Nw. Pump & Equip. Co.*, 925 P.2d at 1244-45 (holding that the insurer was entitled to dispute coverage based on exclusions in the policy and would not be liable for the settlement costs if the exclusion applied). Therefore, although this court may look to the allegations in the underlying complaint to determine whether the settled claims are covered by the Policy, TIG's

duty to indemnify is not based on the mere possibility of coverage stemming from the allegations in the complaint.

### B.    Construction of terms

Both parties agree that Oregon substantive law applies to Regence's claims.  Under Oregon law, the initial burden of proving coverage is on the insured, whereas the insurer bears the burden of proving that a particular claim falls within an exclusion in the policy.  *ZRZ Realty Co. v. Beneficial Fire and Cas. Ins. Co.*,194 P.3d 167, 174 (Or. Ct. App. 2008) (citing *Lewis v. Aetna Insurance Co.*, 505 P.2d 914 (Or. 1973), and *Stanford v. Am. Guar. Life Ins. Co.*, 571 P.2d 909 (Or. 1977)).  The interpretation of an insurance policy is a question of law.  *N. Pac. Ins. Co. v. Hamilton*, 22 P.3d 739, 741 (Or. 2001) (citation omitted).

Under Oregon law, a party is generally not entitled to summary judgment in a contract dispute unless "the governing terms of the contract are unambiguous."  *Century Indem. Co. v. Marine Group, LLC*, 848 F. Supp. 2d 1238, 1246 (D. Or. 2012) (citing *Milne v. Milne Constr. Co.*,142 P.3d 475, 478 (Or. Ct. App. 2006)).  A contract provision is considered ambiguous if it is susceptible to "more than one plausible—that is, sensible and reasonable—interpretation."  *Id.* (citations omitted).  The meaning of an ambiguous contract term is a question of fact.  *Id.* (citations omitted).

Oregon courts utilize a multi-step process to determine whether a provision of a contract is ambiguous.  First, the court must examine the text of the policy to determine whether it is susceptible to more than one plausible interpretation.  *Emp'rs Ins. of Wausau v. Tektronix, Inc.*, 156 P.3d 105, 123 (Or. Ct. App. 2007) (citing *Hoffman Const. Co. of Alaska v. Fred S. James & Co. of Or.*, 836 P.2d 703, 706 (Or. 1992)).  If the policy is unambiguous, or if it includes specific

definitions for disputed terms, the policy must be interpreted in accordance with those unambiguous meanings. *Id.* If the policy does not define disputed terms, the court must invoke assumptions about the "ordinary meaning" of those terms and use other aids to construction. *Id.* If the text of the policy remains ambiguous, the court must examine the disputed terms in the broader context of the policy as a whole. *Id.* Finally, if after construing the terms in the broader context of the policy as whole, an ambiguity remains, the court must construe the policy against the drafter. *Id.*

Thus, when language in an insurance contract is ambiguous, the court must utilize a construction that is "as favorable to the insured as in good conscience will be permitted, and every reasonable intendment will be allowed to support a view that will protect the insured and prevent forfeiture." *Schweigert v. Beneficial Standard Life Ins. Co.*, 282 P.2d 621, 625 (Or. 1955) (citations omitted). This requires that any doubt must be resolved against the author of the instrument, and in favor of the insured. *Id.* However, strict construction is inappropriate when the ambiguous language at issue in the policy was supplied by the insured, its agent, or its broker. *Travelers Indem. Co. v. United States*, 543 F.2d 71, 74 (9th Cir. 1976).

As discussed above, although Marsh requested RICO coverage and the deletion of certain exclusions on Regence's behalf, TIG ultimately drafted the language in the Policy. Any ambiguities in the Policy must therefore be construed against TIG and in favor of Regence.

C.   **Analysis**

Regence asserts that the term "damages" and the capitation exclusion of the Policy are ambiguous. Therefore, this court must determine whether these sections of the Policy are susceptible to more than one reasonable interpretation. After reviewing the record, this court

21 - OPINION AND ORDER

determines that both aspects of the Policy are unambiguous, and that the parties intended to include indemnity as well as defense coverage for RICO claims.

### 1.    "RICO coverage"

The Policy provides that TIG will pay amounts Regence becomes "legally obligated to pay as damages that result from claims covered under any section of [the Policy]." Saka Aff. [722] at Ex. 1, p. 6.  A claim includes lawsuits or other demands where damages are alleged.  *Id.* at p. 31.  For covered claims, TIG agreed to pay damages arising out of "[w]rongful acts committed in the course of [Regence's] business operations . . . [and] providing insurance services."  *Id.* at 72.[2]  As relevant to the *Thomas* actions, the Policy defines "business operations" as the "[r]eview of healthcare services . . . to evaluate the appropriate use of medical care resources," "claims handling," and the "[d]evelopment of practice guidelines and treatment protocols which affect healthcare treatment decisions."  *Id.* at 30, 48.  The Policy also defines "insurance services" to include "[c]laims handling and adjusting."  *Id.* at 31.

Following requests from Regence and Marsh in 1999 and 2000, TIG agreed to amend the sections of TIG's form policy describing what kinds of damages TIG would pay.  As a result, the Policy at issue provided that TIG would simply pay "damages" rather than "damages in tort."  *Compare id.* at p. 10 *with* p. 72; Kallianis Decl. [708] at Ex. I, p. 5.  Marsh was concerned that TIG's use of "in tort" language in its form policy might not cover RICO claims that could be statutory or intentional rather than tortious.  Kallianis Decl. [759] at Ex. E, p. 15, 20-21.  TIG

---

[2]  Oregon courts broadly construe the phrase "arising out of" to mean "originating from, incident to, or having connection with."  *Oakridge Cmty. Ambulance Serv., Inc. v. U.S. Fid. & Guar. Co.*, 563 P.2d 164, 166-67 (Or. 1977) (citation omitted).

also deleted the RICO exclusion in its entirety.  Kallianis Decl. [708] at Ex. I, p. 5; Saka Aff.

[722] at Ex. 1, p. 71.

TIG further amended the Policy's exclusions for "Expected or Intended Injury" and

"Violation of Law" insofar as they applied to RICO claims.  Kallianis Decl. [708] at Ex. I, p. 5-6.

Saka Aff. [722] at Ex. 1, p. 71 (stating that the expected injury exclusion "does not apply to

actions involved [sic] the actual or alleged violation of [RICO]" and the violation exclusion

"does not apply to . . . any claims arising out of [a RICO] action").  TIG changed the "violation of

law" provision because it believed a violation of RICO would be a violation of law.  Kallianis

Decl. [759] at Ex. E, p. 37.  Lantry testified that he deleted the "expected and intended" exclusion

in both the Regence and Coventry policies to provide RICO coverage and "effectuate[] our intent

to providing the protections for RICO."  Saka Aff. [722] at Ex. 156, p. 19.  TIG also agreed to

amend the exclusion regarding "Non-Compensatory Amounts" so that the exclusion for punitive

or exemplary damages was deleted, and the section pertaining to the "multiplied portion of any

award" did not apply to RICO claims.  *Compare id.* at Ex.1, p. 15 *with* p. 47.

Marsh explained that it intended to "restore as much RICO coverage as possible."

Kallianis Decl. [759] at Ex. E, p. 28.  Marsh did not want to limit Regence's policy to only

defense costs.  *Id.* at Ex. E, p. 35.  Marsh, however, did not guarantee indemnity coverage to

Regence, but instead simply informed Regence that it intended to secure indemnity coverage.  *Id.*

at Ex. E, p. 36.  TIG contends that at that time, TIG believed Marsh's primary concern was

defense costs rather than indemnity under RICO.  Kallianis Decl. [759] at Ex. H, p. 4-5.

Based on the undisputed facts, this court concludes that the parties intended to include

defense and indemnity coverage for RICO claims under the Policy.  The Policy unambiguously

provides that several exclusions do not apply to actual or alleged RICO claims. In particular, TIG's agreement to delete the punitive damages exclusion and the language allowing for multiplied awards in RICO claims must be interpreted as consistent with a grant of indemnity coverage for RICO claims. If the parties had only intended defense coverage for RICO claims, these amendments would have been superfluous. The actions by TIG and Marsh in deleting the RICO exclusion, the "in tort" language, the "Expected or Intended Injury" exclusion, and the "Violation of Law" exclusion also demonstrate the parties' intent of providing complete RICO coverage for indemnity and defense costs.

Furthermore, when TIG delivered the policy binder to Marsh for Regence, the accompanying letter provided that:

> In consideration of the additional premium listed below, exclusion #17, [RICO] exclusion, will be deleted. . . .
>
> The *RICO coverage* will be provided sharing the $30M per claim/$30M annual aggregate limits of liability of the managed care errors & omissions coverage, and sharing the same $250,000 per claim/$500,000 annual aggregate retention, applicable to *indemnity* only.

Kallianis Decl. [708] at Ex. I, p. 5-6 (emphasis added). This court cannot ignore TIG's decision to include the term "indemnity" in its description of the RICO coverage it was offering. TIG also internally acknowledged the likelihood that indemnity coverage was included in the Policy. To the extent that an ambiguity exists in the Policy, the court construes the Policy against TIG and in favor of coverage.

## 2.    Capitation exclusion

Exclusion 21(g) in the Policy excludes coverage for claims arising out of "[c]apitation payments, including any withholds for risk or bonus agreements, or payments, fee-for-service

payments or other salary payments owed to contracted or employed health care providers[.]"

Saka Aff. [722] at Ex. 1, p. 14.  TIG contends that this exclusion bars coverage for the *Thomas*

settlement because that case involved claims regarding fee-for-service payments.  Regence

responds that the claims in *Thomas* were not based on contracts between the *Thomas* plaintiffs

and Regence, and did not simply involve "owed" payments.  *See* Saka Aff. [722] at Exs. 106,

111.

      Firstly, the court finds the exclusion to be unambiguous.  The parties have not presented

competing interpretations of the exclusion, and the language is clear on its face.  The plain

meaning of a "capitation payment," when referring to health care providers, is "a fixed per capita

payment made periodically to a medical service provider . . . by a managed care group ([such] as

an HMO) in return for medical care provided to enrolled individuals."  Merriam-Webster,

http://www.merriam-webster.com/dictionary/capitation (last visited Oct. 11, 2012) (providing

medical definition).  Thus, the Policy does not provide coverage for claims arising out of fixed

per capita payments made to medical service providers.  As written, the exclusion potentially

could apply to the claims in *Thomas* because the allegations arose from complaints by medical

providers that they were denied fee-for-service or per capita payments by Regence.

      In determining whether the exclusion applies to the *Thomas* claims, both parties refer the

court to non-binding state court decisions involving similar exclusions and RICO claims.  *See*

*Executive Risk Indem., Inc. v. CIGNA Corp.*, 976 A.2d 1170, 1171-74 (Pa. Super. 2009) (holding

that a similar policy exclusion did not preclude coverage for RICO claims alleged against HMO

because "the claims themselves involve the method of doing business—to wit, . . . [that the HMO

had] engaged in a policy designed to short change the providers"); *Wellpoint, Inc. v. Cont'l Cas.*

25 - OPINION AND ORDER

*Co.*, Cause No. 49D10-0507-PL-26425 (Jan. 31, 2012) ["TIG's Combined Resp. [758] at Ex.

13"] (holding that the excess insurer was not liable for the HMO's settlement of the RICO claims

because the underlying claims alleged that the medical providers "did not receive amounts they

should have been paid pursuant to their contracts with [the HMO]" and sought to recover "the

amounts contractually owed but wrongfully withheld").  This court need not decide which

authority's reasoning is more persuasive because TIG represented to its reinsurers during

arbitrations that the Policy provided coverage for the *Thomas* claims.   As a result, the court

deems TIG to have admitted that the capitation exclusion does not apply to the claims alleged in

*Thomas*.

### 3.    Judicial Estoppel

The doctrine of judicial estoppel "precludes a party from gaining an advantage by taking

one position, and then seeking a second advantage by taking an incompatible position." *Rissetto*

*v. Plumbers & Steamfitters Local 343,* 94 F.3d 597, 600-01 (9th Cir. 1996) (citations omitted).

The doctrine should be invoked to maintain "general considerations of the orderly administration

of justice and regard for the dignity of judicial proceedings," and to "protect against a litigant

playing fast and loose with the courts." *Hamilton v. State Farm Fire & Cas. Co.*, 270 F.3d 778,

782 (9th Cir. 2001) (citation and alteration omitted).  Because this doctrine directly affects the

integrity of the court in which a party seeks to take an inconsistent position, federal law governs

the application of judicial estoppel in this court, even in this diversity case.[3]  *Rissetto,* 94 F.3d at

---

[3]    Accordingly, even though Oregon law may not authorize the duty to indemnify to be
extended by estoppel, *see Day–Towne v. Progressive Halcyon Ins. Co.*, 164 P.3d 1205, 1210-11
(Or. Ct. App. 2007); *Nw. Pump & Equip. Co.*, 925 P.2d at 1245, this court must use principles of
federal law to determine whether TIG may be judicially estopped from denying its duty to
indemnify in this case.

603-04; *see also Milton H. Greene Archives, Inc. v. Marilyn Monroe LLC*, _ F.3d _, 2012 WL

3743100 (9th Cir. Aug. 30, 2012).

The Supreme Court has identified three factors that a district court may consider when

determining whether to apply the doctrine of judicial estoppel:

> First, a party's later position must be clearly inconsistent with its earlier position.
> Second, courts regularly inquire whether the party has succeeded in persuading a
> court to accept that party's earlier position, so that judicial acceptance of an
> inconsistent position in a later proceeding would create the perception that either the
> first or the second court was misled. . . . A third consideration is whether the party
> seeking to assert an inconsistent position would derive an unfair advantage or impose
> an unfair detriment on the opposing party if not estopped.

*New Hampshire v. Maine*, 532 U.S. 742, 750-51 (2001).

In the Ninth Circuit, a district court may also consider whether "a party's position is

tantamount to a knowing misrepresentation to or even fraud on the court." *Milton H. Greene

Archives, Inc.*, 2012 WL 3743100 (quoting *Wyler Summit P'ship v. Turner Broad. Sys., Inc.*, 235

F.3d 1184, 1190 (9th Cir. 2000)). Conversely, where the incompatible position was "based not

on chicanery, but only on inadvertence or mistake, judicial estoppel does not apply." *Id.*

Regence has presented considerable evidence demonstrating that TIG internally

recognized that the capitation exclusion was inapplicable to the claims asserted in *Thomas*, and

that it represented that position to its reinsurers. *See. e.g.*, Saka Aff. [722] at Ex. 61, p. 4; Ex.

63, p. 2; Ex. 64, p. 9; Exs. 70-80; Ex. 103 at p. 8, 14. The record also shows that TIG asserted

that the Policy provided coverage for the *Thomas* claims during arbitrations with TIG's

reinsurers, and that TIG received substantial amounts from its reinsurers to settle several

managed care claims, including the claim asserted by Regence. *Id.* at Exs. 99-100, 135-136, 146

p. 6, 158 p. 7. These inconsistent positions with TIG's current arguments provide a basis for the

27 - OPINION AND ORDER

court to estop TIG from arguing that the exclusion applies in this case. *See Estate of Ashman v. C.I.R.*, 231 F.3d 541, 543 (9th Cir. 2000) (citing *Johnson v. Oregon*, 141 F.3d 1361, 1369 (9th Cir. 1998)) ("An inconsistent position taken with an insurance carrier . . . on the one hand and in a court on the other can result in judicial estoppel."). TIG's current position is inherently inconsistent with its earlier position, it received a substantial settlement in part based on its previous representation, and this court believes that TIG would derive an unfair advantage if it were now allowed to deny coverage based on the capitation exclusion. Accordingly, this court GRANTS Regence's Motion for Partial Summary Judgment on the Capitation Exclusion [709] and DENIES Regence's Motion for Partial Summary Judgment on the Duty to Indemnify [711].

III.    **TIG's Motion for Partial Summary Judgment on Regence's Bad Faith Claims [706]**

Regence alleges that TIG acted in bad faith when it handled the claims and responded to Regence's requests to pay the *Thomas/Love* settlement and the defense costs in *Tacoma*, *Thomas/Love*, and *Solomon*. TIG contends that under Oregon law, Regence's claim fails as a matter of law because it cannot prove a "special relationship" between the parties. Regence contends that this court has already rejected TIG's argument following its motion to dismiss. For purposes of this motion, both parties agree that Oregon law applies. Accordingly, the court need not discuss the parties' choice of law arguments.

A.    **Special relationship**

Under Oregon law, when a relationship arises out of a contract, one of the contracting parties may bring a claim for negligence only if a standard of care exists that is separate from the terms of the parties' contract. *Georgetown Realty, Inc. v. Home Ins. Co.*, 831 P.2d 7, 12 (Or.

1992). Thus, to be liable in tort, a "special relationship" must exist between the parties independent of the contract. *Bennett v. Farmers Ins. Co. of Or.*, 26 P.3d 785, 798 (Or. 2001).

A special relationship is often defined by four traits: (1) one party relinquishes control over matters, usually financial, to the other party; (2) the controlling party is authorized to exercise independent judgment; (3) the relinquishing party relies on the controlling party to further its interests; and (4) the relationship resembles a relationship in which the law imposes a duty on the parties to act reasonably. *Bell v. Public Emps. Ret. Bd.*, 247 P.3d 319, 326 (Or. Ct. App. 2010) (citations omitted). Special duties exist in professional relationships, such as between attorneys and their clients, and in similar relationships based on loyalty or trust. *Onita Pacific Corp. v. Trustees of Bronson*, 843 P.2d 890, 896-97 (Or. 1992). In insurance contracts, a special relationship may exist between an insurer and its insured, or between a primary insurer and its excess insurer, based on the duty to exercise reasonable care in attempting to settle third-party claims within the policy limits. *Id.* at 897 (citing *Maine Bonding v. Centennial Ins. Co.*, 693 P.2d 1296, 1298-1302 (Or. 1985)).

An insurer and its insured maintain a special relationship because the insurer often assumes the obligation to defend the insured. *Bennett*, 26 P.3d at 799 (citation omitted). "That relationship, by its nature, allowed the insurer to step into the shoes of the insured and to control the subject matter of the relationship, namely, the insured's own financial liability." *Id.* As the Oregon Supreme Court explained:

> The focus is not on the subject matter of the relationship, such as one party's financial future; nor is it on whether one party, in fact, relinquished control to the other. The focus instead is on whether the nature of the parties' relationship itself allowed one party to exercise control in the first party's best interests. In other words, the law does not imply a tort duty simply because one party to a business relationship begins to dominate and to control the other party's financial future. Rather, the law implies

> a tort duty only when that relationship is of the type that, by its nature, allows one
> party to exercise judgment on the other party's behalf.

*Id.*

Similarly, an insurer has a duty to exercise diligence and care toward the insured when the insurer has the right to control the defense of the litigation. *Maine Bonding v. Centennial Ins. Co.*, 693 P.2d at 1298 (citing *Radcliffe v. Franklin Nat'l Ins. Co.*, 298 P.2d 1002, 1011 (Or. 1956)). The special duty exists because the insured "effectively relinquishes control over the defense to the insurer and places the insured's potential monetary liability in the insurer's hands." *Conway v. Pacif. Univ.*, 924 P.2d 818, 824 (Or. 1996). "Because the existence of a special relationship is a fact-specific inquiry, it is generally one for the trier of fact; if, however, the relevant facts are undisputed, the court may decide the question as a matter of law." *Mead v. Legacy Health Sys.* 220 P.3d 118, 124 (Or. Ct. App. 2009), *rev'd in part on other grounds by* 283 P.3d 904 (Or. 2012) (citation omitted).

### B.    Prior ruling

In 2008, TIG moved to dismiss three of plaintiffs' claims, including the bad faith count, based on the absence of a special relationship between the parties. On August 12, 2008, this court denied TIG's motion on multiple grounds. *See* Order [40]. First, it held that the parties had not resolved the choice of law issue, which Regence has now conceded for purposes of this motion. *Id.* at 3. Second, this court held that to the extent Regence asserts bad faith based on TIG's conduct prior to the issuance of the policy, such a claim does not rest on the existence of a special relationship. *Id.* at 5. Lastly, the court explained that material issues of fact "regarding the proper scope and definition of the relationship" between the parties, whether TIG was a party to a joint defense agreement, whether it exercised control over privileged reports from Regence,

30 - OPINION AND ORDER

and whether the degree of control exercised by TIG was sufficient to create a special relationship precluded dismissal at that early stage. *Id.* at 5-6.

Five years later, TIG again seeks summary judgment on this issue. TIG asserts that the plain language of the 2004 settlement agreement and a statement by Regence's counsel in *Thomas* demonstrates that no special relationship exists as a matter of law.

C.    **Analysis**

As an initial matter, the court declines to bar TIG from raising its argument based on the absence of a special relationship under the "law of the case" doctrine. Under this doctrine, a court is ordinarily precluded from reexamining an issue previously decided by the same court in the same case. *United States v. Jingles*, 682 F.3d 811, 816 (9th Cir. 2012) (citation omitted). "For the doctrine to apply, the issue in question must have been 'decided explicitly or by necessary implication in [the] previous disposition.'" *Id.* (citations omitted). This court previously denied TIG's motion on the special relationship issue pursuant to the Federal Rule of Civil Procedure 12(b)(6) standard, which is based solely on the pleadings and accepts all well-pled allegations in the complaint as true. Now that significant discovery has been completed, TIG may revisit its arguments with the benefit of extra-pleading evidence.

Regence clarified at oral argument that its bad faith claims are based on TIG's claims handling from November 2004 to the present, and TIG's conduct in relation to its accepted duty to defend in *Thomas*. The record shows that pursuant to the parties' 2004 settlement agreement, Regence maintained "the control of the defense of the litigation" in *Thomas*, and was authorized to "make the ultimate decisions relating to the strategy, including but not limited to, whether to settle; the terms and conditions of any settlement; the amount of any settlement . . . ." Kallianis

Decl. [708], at Ex. A, p. 8. Regence's counsel in *Thomas* also admitted that he never received instructions from TIG on the defense of *Thomas*. Kallianis Decl. [708], at Ex. C, p. 2 ("Did you ever receive instructions from TIG or TIG's counsel as to how to defend the *Thomas* action? No, sir."). However, the record also indicates that the parties agreed to discuss "all major strategic decisions" about the defense of *Thomas*, agreed to "work together to try to adopt mutually agreeable strategies," and that Regence could not commit "any TIG funds without TIG's agreement" or make other decisions about the joint defense group and counsel. Kallianis Decl. [708], at Ex. A., p. 8; *see also* Godes Aff. [738] at Exs. 7-17, 21-30 (showing privileged documents shared with TIG, as well as strategic discussions with TIG's counsel about the defense of *Thomas*).

Based on the undisputed facts in the record, this court concludes that the parties were in a special relationship as a matter of law. Even if this court accepts that Regence maintained control of the defense of *Thomas*, Regence chose its own counsel, and TIG never provided instructions on how to defend *Thomas*, several undisputed facts remain: (1) Regence provided confidential and privileged documents to TIG; (2) TIG requested and was granted access to Regence's counsel's strategic decisions regarding *Thomas*; (3) TIG participated in discussions with Regence about how to resolve *Thomas*; and (4) TIG maintained control over any monetary decisions in *Thomas*. For all of these reasons, this court concludes that the parties were in a special relationship for purposes of Regence's bad faith claims. TIG's Motion for Partial Summary Judgment regarding plaintiffs' Bad Faith Cause of Action [706] is therefore DENIED.

\\\

\\\

32 - OPINION AND ORDER

**CONCLUSION**

For the reasons provided, TIG's Motion for Partial Summary Judgment regarding plaintiffs' Bad Faith Cause of Action [706] is DENIED; plaintiffs' Motion for Partial Summary Judgment regarding the Capitation Exclusion [709] is GRANTED; and plaintiffs' Motion for Partial Summary Judgment regarding TIG's Duty to Indemnify [711] is DENIED. This matter shall proceed to trial under the current schedule. To the extent that this ruling resolves some of the issues presented in the parties' recently filed motions in limine, the court permits the parties to amend their briefings.

IT IS SO ORDERED.

Dated this _12_ day of October, 2012.

Ancer L. Haggerty
United States District Judge

33 - OPINION AND ORDER